# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 13, 2014

## STATE OF TENNESSEE v. PEDRO IGNACIO HERNANDEZ

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-525     Monte Watkins, Judge**

---

**No. M2013-01321-CCA-R3-CD - Filed July 29, 2014**

---

The defendant, Pedro Ignacio Hernandez, appeals from his Davidson County Criminal Court jury convictions of three counts of rape of a child, one count of attempted rape of a child, and five counts of aggravated sexual battery, claiming that the trial court erred by deeming him competent to stand trial; that the trial court erred by denying a motion to suppress his pretrial statement to police; that the trial court erred by denying a motion to suppress the results of DNA testing conducted using DNA that was unconstitutionally obtained; that the trial court erred by allowing the State to present evidence that the defendant displayed a photograph of his genitalia to the victim; that the evidence was insufficient to support two of the defendant's convictions of rape of a child; that dual convictions of rape of a child in count one and aggravated sexual battery in count twelve were prohibited by principles of due process; and that the trial court erred by imposing consecutive sentences and by sentencing the defendant as a Range II offender. Because the trial court erroneously imposed a Range II sentence for the defendant's convictions of rape of a child in violation of constitutional ex post facto protections, the sentence for each conviction of rape of a child is modified from a sentence of 28 years to a sentence of 25 years. The judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Jeffrey A. DeVasher (on appeal); and Aimee Solway and Randi Hess (at trial), Assistant District Public Defenders, for the appellant, Pedro Ignacio Hernandez.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kristen Menke and Roger

Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Davidson County Grand Jury charged the defendant with 10 counts of rape of a child and five counts of aggravated sexual battery for offenses allegedly perpetrated against the nine-year-old victim between January 1, 2010, and December 1, 2010. At the conclusion of a four-day trial, a Davidson County Criminal Court petit jury convicted the defendant of three counts of rape of a child, one count of attempted rape of a child, and five counts of aggravated sexual battery. The trial court dismissed two of the counts of rape of a child for a failure of proof and declared a mistrial as to a third count of rape of a child on motion by the State. The jury acquitted the defendant of two counts of rape of a child and one count of aggravated sexual battery. Following a sentencing hearing, the trial court imposed a total effective sentence of 84 years' incarceration, to be served at 100 percent by operation of law.

At trial, the 12-year-old victim testified that she was born on January 11, 2001, and that she lived with her parents, her sister, her brother, and a friend of her father, Hector Hernandez, and Mr. Hernandez's family. She said that in addition to those mentioned, the defendant had also lived with her family when they lived at 1216 Canyon Ridge in Nashville. The victim recalled that when she was nine and a half years old, she reported to her school counselor that the defendant had been "touching" her inappropriately. She said that the defendant touched her in "the front where [her] private part; and like the back; and, [her] neck." Utilizing a drawing of a "[l]ittle girl who is naked," the victim circled the parts of her body that the defendant had touched.

The victim recalled that on the day that she reported the touching to her school counselor, her little sister saw the defendant pull the victim into his room, and the victim became "scared that he was going to do something to her too." She said that after pulling her into his room on that day, the defendant tried to touch her "[f]ront part" and tried to pull her pants down, but she "kept on moving around." She said that there was "[a] little bit" of contact between the defendant's hand and the "[o]utside" of her "[f]ront part." She indicated this location for the jury but did not mark it on the drawing.

The victim testified that on another occasion, the defendant forced her onto the bed, and she then fell onto the floor because he had pulled her pants down, and she "couldn't get up." She said that he pushed her down and held her wrists. She said that she saw the defendant's penis but that it did not touch her on that day. The defendant did, however, touch the "outside" of her "private" with his hand. She recalled that "white stuff" came "out of his private and it got on [her] hand." She said that she thought the defendant used a towel

to "wipe it off" and that she "ran into the restroom" to wash her hands. She said that before the white stuff came out of the defendant's "private," the defendant "was trying to put [his penis] on [her] face," but she "elbowed him and then [she] ran." She also recalled that before the white stuff came out, the defendant had been trying to put his penis into her vagina. She said that while she was in the floor, the defendant pulled her pants down and "sticked it in there, but, like, only . . . on the . . . outside." She said that the defendant's penis went "inside, but not like . . . deep inside." She said that the defendant was "[m]oving back and forth."

The victim recalled another occasion when the defendant placed his penis between her "butt cheeks" and moved it back and forth. She could not recall whether the defendant ejaculated on that occasion.

The victim testified that on another occasion the defendant kissed her "[i]nside that line" on the drawing of the girl. Again, she indicated the location for the jury but did not mark it on the drawing.

The victim also recalled an occasion when the defendant "grabbed [her] and pushed [her] in his room" and then "threw [her] down on the bed, and then he just - - like, his hand was touching down in [her] private part." She indicated the location on the drawing as "[o]utside of the line."

The victim recalled another incident when the defendant "just started touching [her] right in the front part."

She recalled that on another occasion the defendant "barely" penetrated her "private part" with his penis before going to the closet to wipe "white stuff" on a red towel. She tried to differentiate yet another incident by demonstrating the relative positions of their bodies when the defendant penetrated her vagina with his penis. On that occasion, she said, nothing came out of the defendant's penis. She clarified that she only saw the defendant wipe the "white stuff" with the red towel one time.

The victim testified that on another occasion, the unclothed defendant climbed on top of her while she was clothed and began "moving back and forth." She said, "I kept moving my hand and then, like, the next thing I know when I saw my hand it had that white stuff on it."

She said that on another occasion when the defendant had a "Dora blanket" on his bed, the defendant got on top of her and "started kissing [her] neck." She said that the blanket was on the defendant's bed all the time. She said that she knew some of the "white stuff" got onto the blanket because it left a "sticky" "white mark."

She said that in addition to the offenses about which she had testified, the defendant had touched her inappropriately "[p]robably two more times." She said she could not remember specifically what had happened on those occasions.

The victim testified that all of the incidents happened when her parents were not home. She recalled one occasion when her sister might have seen the defendant assaulting her. On that occasion the defendant rubbed his penis against her body while she was clothed.

The victim said that she sometimes went into the defendant's room to watch television before the touching began but that she did not go into that room after the assaults began. On one occasion when she was in his room watching television, the defendant came into the room and began touching her waist and hip and kissing her neck.

The victim testified that on one occasion, the defendant showed her a photograph of his genitalia on his cellular telephone. She could not recall when he had shown her the picture, where she was when she saw it, or what she was doing when she saw it.

The victim testified that she did not report the abuse because she "got scared that he was going to do something to" her. She admitted that she had no reason to believe that the defendant would hurt her, saying, "I just thought he would do something." The victim testified that she did not share any of the details of the abuse with her mother because "it's embarrassing" and because she was "just scared."

Hollye Gallion, a pediatric nurse practitioner and the clinical director of the Our Kids Center in Nashville, testified as an expert in pediatric nursing and forensic examinations. She examined the victim on December 1, 2010. The victim told her, "This man who lives in my house, Pedro. He took me in his room and he locked the door, and he put his thing in my thing. And I kicked him in his stomach. And I pulled my pants up and ran away. It happened Monday afternoon." The victim reported that the defendant had placed his hand on the inside of her "private" and that the abuse had occurred once a week for the six weeks prior to December 1, 2010. The victim's mother reported that in September 2010, the victim "had had an episode of genital bleeding and a rash" and had been "treated for a urinary trac[t] infection." The victim's mother also reported to Ms. Gallion that the victim had recently begun to complain "of pain with urination, again, and . . . a rash in her genital area." Ms. Gallion opined that there was no direct correlation between sexual activity and a urinary tract infection.

An anogenital examination of the victim revealed "a little superficial crack, or

-4-

tear, in the skin on the inside of the left labia," "some areas of redness" adjacent to the victim's hymen, and "a little area of purplish color around the urethra." Ms. Gallion said that there was no injury or signs of trauma to the victim's hymen. Ms. Gallion noted that redness in the genital area was not uncommon in children due to their poor hygiene habits. She said that the injury to the victim's labia could be consistent with an injury due to friction but that the discolored area around her urethra was a normal part of the victim's anatomy rather than a sign of trauma. Ms. Gallion said that it was not her job to opine whether the victim was or was not sexually abused.

Metropolitan Police Department ("Metro") Detective Eric Fitzgerald testified that he began investigating this case when contacted by the victim's school counselor. In that initial referral, Detective Fitzgerald learned "[t]hat a family friend had been doing things to [the victim], sexual things to her." After conducting a brief interview of the victim and her mother to ascertain "the basics" of the victim's claim, Detective Fitzgerald sent the victim for a forensic interview at the Child Advocacy Center. During the brief initial interview, Detective Fitzgerald suggested that someone in the victim's family wear "a body wire" to try to extract a confession from the defendant. He recalled that the victim's mother was "indifferent" to the suggestion of a body wire and indicated a preference for accompanying the victim to the medical examination.

Detective Fitzgerald said that he and Officer Gilbert Ramirez, who spoke Spanish, contacted the victim's father and asked him to wear the body wire, and he agreed. Detective Fitzgerald explained that neither of the victim's parents spoke English and that Officer Ramirez worked as a translator. Detective Fitzgerald said that the victim's father, while fitted with audio recording equipment, tried to elicit a confession from the defendant but was unsuccessful. Detective Fitzgerald testified that he had previously instructed the victim's father to ask the defendant to leave if he did not confess to the abuse. He said that he and Officer Ramirez waited outside to intercept the defendant after the victim's father ordered him out of the house. At that point, they asked the defendant if he would come to the police department for an interview, and he agreed. Officer Ramirez transported the defendant to the police station in a patrol car.

Detective Fitzgerald interviewed the defendant, with Officer Ramirez acting as an interpreter. A video recording of the interview, in which the defendant spoke exclusively in Spanish and Officer Ramirez spoke primarily in Spanish, was played for the jury. The jury was also provided with a transcript that the parties had agreed was an accurate translation of the video. The transcript itself, which was prepared by a court certified interpreter, was made an exhibit. During the interview, the defendant acknowledged having had sex with the victim, claiming that she had come into his room naked and demanded that he have sex with her. He said that the victim threatened to tell her father if he did not comply

and that he felt as though she was in a position of power because she could speak English and he could not. Detective Fitzgerald acknowledged that during the interview, he attempted to "minimize what the offense is and, kind of, present it in a light that it's not nearly as serious as someone would think it might be" in order to make the defendant "feel a little more comfortable . . . and . . . open up a little bit."

Detective Fitzgerald said that he collected the rape kit from the Our Kids Center. From the defendant's bedroom, he collected a Dora blanket, a blue towel, and a red towel. He took the items to the Metro property room and filled out a request that the items be sent to the Tennessee Bureau of Investigation ("TBI") for testing. He also submitted the buccal swabs that he obtained from the defendant and the victim for deoxyribonucleic acid ("DNA") testing.

During cross-examination, Detective Fitzgerald acknowledged that he did not interview the other adults who lived in the house with the defendant and the victim and that he did not collect the victim's clothing from her hamper. Detective Fitzgerald conceded that although the defendant's DNA was located on the towels and blanket taken from the defendant's room, the victim's DNA was not. He acknowledged that he collected the defendant's cellular telephone but did not find a photograph of the defendant's genitalia on the telephone.

TBI Special Agent and Forensic Scientist Doctor Laura Boos testified that testing performed on the Dora blanket confirmed the presence of semen and sperm and that DNA analysis confirmed that the defendant was the contributor. The blue towel was negative for the presence of semen, but testing confirmed the presence of the defendant's semen and sperm on the red towel. Doctor Boos testified that she did not find the victim's DNA on either of the towels or on the blanket.

During cross-examination, Doctor Boos acknowledged that the labial swab taken from the victim was negative for the presence of semen or sperm.

Officer Gilbert Ramirez testified that he utilized his experience in working with members of the Hispanic community when acting as an interpreter during the defendant's interrogation. He said that he tried to ensure that the defendant understood what he was talking about before moving on to the next question. He stated that on "several" occasions, the defendant appeared "a little puzzled," so Officer Ramirez took extra time to make sure that the defendant understood. He said that he felt confident in his interaction with the defendant.

Officer Ramirez testified that as part of the investigation in this case, he

-6-

listened to audio recordings of telephone calls placed by the defendant to the victim's mother. Most of the calls lasted approximately 15 minutes, and the conversations took place in "normal tones." During one telephone call, the defendant sounded angry.

At the conclusion of Officer Ramirez's testimony, the State read its election of offenses. In the interest of brevity, we recite only the election of those counts that resulted in convictions:

> Count One of the indictment alleges an act of rape of a child against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant penetrated the victim's genital area with his penis. Using the anatomic drawings, the victim testified that the defendant moved back and forth with his penis inside her genital area. She said this happened on the floor in the defendant's bedroom, and something white came out of his penis and got on her hand.

> Count Two of the indictment alleges an act of rape of a child against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant performed cunnilingus on the victim. Using the anatomic drawings, the victim testified that the defendant used his mouth to kiss inside her genital area.

> . . . .

> Count Three of the indictment alleges an act of rape of a child against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant penetrated the victim's genital area with the defendant's fingers. The victim testified that the defendant pushed her into the room and put his fingers inside her "front part" which she identified as the female genital area.

> Count Four of the indictment alleges an act of rape of a child against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant penetrated the victim's genital area with his penis. The victim testified that the defendant threw her down on the bed and moved back and forth with "his thing" inside her "private part." She identified "his thing" as the defendant's penis and her "private part" as her

-7-

genital area. The victim also testified that, when it was over, the defendant put "white stuff" from his penis into a red towel in his closet. The victim was lying on the bed crying.

Count Five of the indictment alleges an act of rape of a child against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant penetrated the victim's genital area with his penis. Using the anatomic dolls, the victim testified that the defendant was holding both of her legs up while putting his "private" inside her genital area.

. . . .

Count[] Eleven of the indictment alleges an act of aggravated sexual battery against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant fondled the victim's genital area with his hand. The victim testified that the defendant pulled her into his room and was trying to pull her pants down. Using the anatomic drawings, the victim indicated that his hand touched the outside of her genital area on the skin. This was the last time the defendant touched her before she told her counselor at school.

Count Twelve of the indictment alleges an act of aggravated sexual battery against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant fondled the victim's genital area with his hand. The victim testified that she was in the defendant's bedroom and he pulled her pants down. She was trying to get away from the defendant and she fell on the floor. While the victim was on the floor, the defendant touched the outside of her genital area on the skin.

Count Thirteen of the indictment alleges an act of aggravated sexual battery against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant rubbed his penis between the victim's buttocks. The victim testified that the defendant moved back and forth on her with his penis inside her butt cheeks but outside the part she uses to go to the bathroom.

-8-

. . . .

     Count Fifteen of the indictment alleges an act of aggravated sexual battery against [the victim], d/o/b 1/11/2001, and refers to the following conduct: The defendant rubbed his penis against the victim's genital area. The victim testified that the defendant was trying to put "his thing" in her "private part," but her clothes were on, so "his thing" touched the outside of her "private" on the clothes. She identified her "private part" as her genital area and "his thing" as the defendant's penis. The victim also testified that she thought her sister saw this happen because she was waiting for her to come out of the room and she asked the victim if she was okay and asked why she was crying.

The State dismissed counts nine and ten for want of proof.

     After reading the election of offenses, the State rested. Following a full *Momon* colloquy, the defendant elected not to testify and chose not to present any proof.

     Based upon the evidence presented at trial, the jury returned verdicts of guilty as charged of rape of a child in counts one, four, and five and of aggravated sexual battery in counts eleven, twelve, thirteen, and fifteen. The jury convicted the defendant of the lesser included offenses of attempted rape of a child in count two and aggravated sexual battery in count three. The jury found the defendant not guilty in counts six, seven, and fourteen. The jury was unable to reach a verdict in count eight, and the trial court declared a mistrial as to that count.

     Following a sentencing hearing, the trial court imposed a sentence of 28 years for each of the defendant's convictions of rape of a child and ordered that the sentences be served consecutively. The trial court imposed a sentence of 10 years each for the defendant's convictions of aggravated sexual battery and a sentence of 10 years for his conviction of attempted rape of a child. The court ordered that the 10-year sentences for attempted rape of a child and aggravated sexual battery be served concurrently with each other and concurrently with the sentences imposed for the convictions of rape of a child. The total effective sentence is, therefore, 84 years. By operation of law, the defendant must serve 100 percent of his 84-year sentence.

     The defendant filed a timely but unsuccessful motion for new trial, followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by deeming him competent to stand trial, that the trial court erred by denying his motions to

suppress his pretrial statement to police and the results of DNA testing obtained using the DNA sample provided by the defendant during his interrogation, that the trial court erred by permitting the victim to testify that the defendant had shown her a photograph of his genitalia, that the evidence was insufficient to support his convictions of rape of a child in counts one and five, that his convictions of rape of a child in count one and aggravated sexual battery in count twelve violate due process principles, that the trial court erroneously sentenced him as a Range II offender for his convictions of rape of a child in violation of the constitutional protection against ex post facto laws, and that the trial court erred by imposing consecutive sentencing. We consider each claim in turn.

*I. Competency*

In his first challenge on appeal, the defendant asserts that the trial court erred by deeming him competent to stand trial. He claims that he lacked the ability to comprehend and appreciate his legal situation and to participate in his defense. The State contends that the trial court did not err by finding the defendant competent.

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a mentally incompetent person from being put to trial." *State v. Reid*, 213 S.W.3d 792, 808 (Tenn. 2006) (citing *Pate v. Robinson,* 383 U.S. 375, 378 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000)). That said, "[i]n Tennessee, a criminal defendant is presumed to be legally competent." *State v. Johnson*, 401 S.W.3d 1, 17 (Tenn. 2013) (citing *State v. Reid*, 164 S.W.3d 286, 306-07 (Tenn. 2005); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)). As such, the defendant bears the burden of establishing his incompetence by a preponderance of the evidence in the trial court. *See Reid*, 164 S.W.3d at 306–08. The assessment of competency is multi-pronged. To be deemed competent, a defendant must possess "'the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and assist in preparing his [or her] defense.'" *Johnson*, 401 S.W.3d at 17 (quoting *Reid*, 164 S.W.3d at 306). "A defendant may prove his or her incompetency with evidence of the defendant's 'irrational behavior, his [or her] demeanor at trial, and any prior medical opinion on competence to stand trial.'" *Johnson*, 401 S.W.3d at 17 (citing *State v. Kiser*, 284 S.W.3d 227, 246 (Tenn. 2009) (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975))). The trial court's findings regarding the defendant's competence "are conclusive on appeal unless the evidence preponderates otherwise." *Oody*, 823 S.W.2d at 559.

Prior to trial, the defendant filed a motion seeking a judicial determination of

his competence to stand trial pursuant to Tennessee Code Annotated section 33-7-301.[1] At the first hearing on the defendant's motion, Doctor Antonio E. Puente, a clinical neuropsychologist, testified that he specialized in diagnosing and treating Axis II mental disorders in Spanish-speaking individuals, primarily those from Central America. He explained that Axis II disorders "tend[] to be more permanent in nature of one big area that happens to be essentially what we might call retardation."[2] He also noted that he had special expertise in the area of malingering, and he explained that he had authored the most recent peer-reviewed scientific study of malingering and that he was "one of three authors of the Spanish translation of the Test of Memory Malingering, TOMM, which is published by TEA."

---

[1]Code section 33-7-301(a)(1) provides:

> When a defendant charged with a criminal offense is believed to be incompetent to stand trial, or there is a question about the defendant's mental capacity at the time of the commission of the crime, the criminal, circuit, or general sessions court judge may, upon the judge's own motion or upon petition by the district attorney general or by the attorney for the defendant and after hearing, order the defendant to be evaluated on an outpatient basis. The evaluation shall be done by the community mental health center or licensed private practitioner designated by the commissioner to serve the court or, if the evaluation cannot be made by the center or the private practitioner, on an outpatient basis by the state hospital or the state-supported hospital designated by the commissioner to serve the court. If, and only if, the outpatient evaluator concludes that further evaluation and treatment are needed, the court may order the defendant hospitalized, and if in a department facility, in the custody of the commissioner for not more than thirty (30) days for further evaluation and treatment for competence to stand trial subject to the availability of suitable accommodations.

> T.C.A. § 33-7-301(a)(1).

[2]We note that Tennessee Code Annotated section 39-13-203 was recently amended by changing all references of "mental retardation" to "intellectual disability." *See* T.C.A. § 39-13-203 (2010). "This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts; the manual is often referred to by its initials 'DSM,' followed by its edition number, e.g., 'DSM–5.'" *Freddie Hall, Petitioner v. Florida*, No. 12-10882, slip op. at 2 (U.S. May 27, 2014) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013)). The term "mental retardation" was employed by the witnesses, parties, and the trial court in this case. Rather than alter the numerous quotations, we utilize the term employed when quoting excerpts from the record.

Doctor Puente testified that he was asked to consult with defense counsel to determine whether counsel's difficulty in working with the defendant "was a cultural issue, linguistic issue, or something having to do with psychology, slash, neuropsychology." He said that, to that end, he attempted to evaluate the defendant on May 22 and 23, 2011. Doctor Puente said that he had difficulty communicating with the defendant from the beginning and that he was unsure whether the difficulty lay in their speaking "different forms of Spanish" or in the defendant's failure to understand the purpose of the evaluation. Eventually, the defendant refused to speak to Doctor Puente altogether, a result that Doctor Puente attributed to the defendant's "psychopathology or mental state." He said that as a result of the defendant's unwillingness to participate, he was unable to complete the evaluation. Doctor Puente testified that although he was unable to make a determination as to the defendant's competence based upon the incomplete evaluation, he did have grave concerns about the defendant's ability to assist in his own defense. He explained,

> If I couldn't complete an evaluation, and I was a Spanish speaker, I was a Ph.D., and I knew something about Honduras, and I couldn't get anything out of him, the question became: If I couldn't do it, how could you as a . . . native from America . . . living in the U.S. with primary English language, how could you do it?

Doctor Puente testified that he tried again to evaluate the defendant in June 2012. At that time, the defendant "didn't get up and walk away" but did present "some challenges the first day." Doctor Puente said that he spent some 15 hours evaluating the defendant in June 2012 and that he spoke with the defendant again just before the hearing. Doctor Puente said that, after having spent nearly 20 hours with the defendant over the course of four different days, he "would rank [the defendant] at one of the lowest levels of performance in terms of intellectual capacity." With regard to the defendant's legal situation, Doctor Puente said, "He has no idea what's going on." Of the defendant's understanding of the competency hearing, Doctor Puente said,

> He knows that there's a hearing. He knows there's going to be a judge, there's going to be two sides, one side is represented by you, and the other side represented by another person. That's all he knows. He doesn't know why we're here, how it's going to work, and what could potentially happen.

Doctor Puente said that the defendant's shame about "his limitations" could explain his "stonewalling" Doctor Puente during the evaluations. He said, "I think the bottom line is his ability to understand how to perform is very rudimentary. I think he knows there's something

-12-

wrong and he's ashamed."

Doctor Puente testified that "the obvious diagnosis" for the defendant's condition was "mental retardation or intellectual disability." He said that he also diagnosed the defendant "as having organic brain syndrome . . . or traumatic brain injury, because there's something wrong about his performance in the tests . . . and his clinical presentation." He opined that the defendant was not malingering. He explained,

> [T]here's probably three reasons. One is that, if he is malingering, he's been malingering for 25 years. This is the way he's presented historically.
>
> Two, he presented that same way to me four times. He's presented to me in front of you, in front of your intern without you. He's presented the same way to Luis, the investigator. And he's presented the same way to Mr. Oleva, who is a fellow inmate, which I had the opportunity to interview. He presented the same way when I heard the Miranda rights, and he presented the same way when I heard the wiretapping audio recording, as well.
>
> So, in essence, I have a multitude of sources that basically tell me the same thing. The one definition of malingering is, you know, reliability, can you be reliable across time. So over a period of well over 12 months, across a variety of individuals, across a variety of circumstances, it's been the same thing.
>
> Third is the pattern of testing. He actually did okay in a couple of tests that I administered. And in the TOMM, for example, . . . he basically just wasn't performing. . . .
>
> . . . And that shutting down could be interpreted by individuals that don't know English or mental retardation or this kind of testing to be indicative of faking or malingering.

Doctor Puente said that if one labeled the defendant as malingering, "which . . . is completely inaccurate and incorrect, the best you could do is say he's malingering like a nine-year-old." He said that the defendant, because of his low intelligence, would be completely unable to develop a sophisticated malingering strategy. Doctor Puente testified that the defendant did

not have the "capacity" to "game the system" by pretending to be intellectually disabled.

Doctor Puente testified that the defendant felt that he had "been manipulated by [the victim], and that he's at a disadvantage because he doesn't have papers. His understanding of what was going on is very limited." He added that the defendant's "Spanish is abysmal." When Doctor Puente administered a test "in Spanish abilities," the defendant's scores "were in the lower one percentile of the population. Really at the bottom of the bell curve." The defendant could not count past 10 and could not recite his alphabet in full. Doctor Puente said that his suspicion that the defendant could neither read nor write was confirmed by the defendant's fellow inmate, Mr. Oleva. Mr. Oleva told Doctor Puente that he had taken the defendant "under [his] wing . . . to assist him" because the defendant "doesn't know what the questions are being asked of him and sometimes he gets confused." Doctor Puente said that Mr. Oleva told the doctor that it sometimes seemed that the defendant "was faking because he was . . . so stupid or so retarded." The defendant's co-workers reiterated this sentiment, stating that the defendant "was out there, that he had difficulty following instructions, that at times he seemed so stupid that he looked like he was faking."

Doctor Puente described the intellectually disabled as "great followers" who "respond to other people that they see as being important to them." Doctor Puente said that interestingly, the defendant tended to "parrot information that came from other inmates rather than parrot information that would have come from" the defendant's attorneys. He explained that this phenomenon was likely due to the shear number of hours the defendant spent in the company of other inmates and to the fact that defense counsel was a woman. As an example, Doctor Puente pointed out that although the defendant said that he "wanted his discovery," the defendant had no idea what "discovery" actually was. Doctor Puente said that although it was possible for the defendant to learn and retain information regarding the criminal trial process, that learning would require great "time, energy, and resources." He testified that all the defendant's training would have to be conducted by native Spanish speakers on a daily basis "over a number of years." It was his opinion, however, that such an undertaking would "be wasted time and energy and funds."

Doctor Puente testified that he was not surprised that the defendant was able to obtain and hold down a job, given that the defendant's job was smoothing cement at construction sites. Doctor Puente said that that job required only physical strength, no education, and little intellectual ability. Doctor Puente also said that a person with the defendant's level of intellectual functioning was particularly well suited to the structure of life in jail.

Doctor Puente testified that the defendant's understanding of the criminal trial

process was "close to nonexistent" and that "his understanding of the facts is very limited." Doctor Puente said that when speaking with counsel, the defendant generally only looked at counsel and smiled and that when called upon to respond, "[h]is responses are brief, incomplete, shallow, concrete, often of little value." As a result, he said, the defendant's "ability to assist [counsel] to develop a credible defense is - - if not nonexistent, it's certainly extremely low." Doctor Puente maintained that the defendant "doesn't understand the concept of discovery," that "[h]e doesn't understand the concept of gathering facts," that "[h]e does not know proof," that "[h]e does not know what a jury is," and that "[h]e does not know what peers mean."

Doctor Puente noted that the defendant suffered from a speech impediment that would be clear to any native Spanish speaker and that the defendant's vocabulary was "abysmal." For these reasons, Doctor Puente inquired whether Spanish was the defendant's first language or whether he was more familiar with "any Indian or related dialects from Honduras," and the defendant replied that Spanish was his first language. Doctor Puente noted that the defendant's speech patterns were the same in an audio-recorded conversation with the victim's father.

Doctor Puente acknowledged that other evaluators had deemed the defendant competent to stand trial, but he said that he did not know how those doctors arrived at their conclusions given that they had "almost the same data."

During cross-examination, Doctor Puente reiterated that the defendant's intellectual disability prevented him from understanding the trial process, from developing "a successful relationship with his counsel," and from assisting his counsel "in developing a credible defense." He said that the defendant understood that what he had done was wrong and that he understood "the gravity of the circumstances he finds himself in." He explained that the defendant knew "the facts but after that it gets a little bit on thin ice." Doctor Puente reiterated that the defendant was unable to write much more than his name and that, if he could read at all, he could not do so beyond a fifth grade level and could not do so in English. Doctor Puente acknowledged that the defendant was able to clarify facts during his pretrial statement to the police and to provide responses to the questions on the Uniform Affidavit of Indigency. Doctor Puente also acknowledged that the defendant was capable of "[v]ery basic reasoning." Doctor Puente said that the defendant was "capable of lying, but, my goodness, what an unsophisticated liar, if ever there was one."

Doctor Puente testified that the defendant reported having suffered a head injury when he first came to the United States, but Doctor Puente acknowledged that he could not confirm the injury. He stated, however, that given the defendant's presentation of symptoms, he had no trouble diagnosing the defendant with organic brain injury. He said

that he based his diagnosis of brain-damage on the defendant's "[o]ne, history; two, interview; three, behavior; four, testing; five, information from his attorney; information from his investigator, information from the intern, information from the other inmate."

During redirect examination, Doctor Puente said that although the defendant was capable of reasoning, the reasoning was unsophisticated. He went so far as to compare the defendant's level of reasoning to a dog or a very young child. Doctor Puente said that he would not hesitate to tell the court if he believed that the defendant was malingering. Doctor Puente said that if the defendant were provided education on the American criminal justice system "seven days a week," he might become competent to stand trial in "a couple of years." Doctor Puente reiterated that the defendant was "at the bottom of the barrel" in terms of "cognitive and intellectual capabilities." He said that the defendant's abilities were "sufficient enough to allow him to engage in the world, but not sufficiently appropriate to understand how it works."

Doctor Jorge Boero, a clinical psychologist, testified on behalf of the State that the defendant was, in fact, competent to stand trial. Doctor Boero explained that Doctor Kimberly Brown had been asked by the State to evaluate the defendant and that Doctor Brown, in turn, had asked Doctor Boero to perform the evaluation because he was a native Spanish speaker. Doctor Boero evaluated the defendant in January 2011, and, as a result of the evaluation, he concluded that although the defendant "does have some cognitive impairments, . . . he was competent to assist his attorney in developing a defense and to stand trial." Doctor Boero said that he gathered the defendant's psycho-social history and then "administered a few tests." He then spoke with the defendant's friend, Lorezo Aguilar.

Doctor Boero testified that the defendant reported that he began school late and that he finished the sixth grade at age 15. The defendant told the doctor that he "had some problems learning" and that since entering the United States he had worked as a brick and block layer at a rate of $11.50 per hour. The defendant reported that he managed his own finances and that he "was in the process of learning how to drive before he was detained." The defendant mentioned no history of mental illness, but he said "that he was depressed about his circumstances and worried about these circumstances."

Doctor Boero testified that the defendant earned a score of 25 out of 30 on a "mini-mental status exam," a score that was "consistent with mild impairment." Doctor Boero said that the defendant "was able to read a brief three word phrase . . . and he was able to write a rudimentary sentence." When given a task to "draw a clock . . . marking the time ten minutes after eleven," the defendant earned a full score, indicating that he could tell time and write the numbers one through 12. Doctor Boero said that on a test designed to measure intelligence, the defendant scored "below the first percentile." He added that the defendant's

"standard scores were very low, indicating very low intellectual function, very poor intellectual function." He said that the defendant's intelligence quotient ("IQ") was 45, a score that seemed at odds with the defendant's report of his social and family history.

The defendant's score on the TOMM, or "test of memory and malingering," indicated that the defendant was not giving his best effort. Doctor Boero said "that there were times when [he] saw [the defendant] point to the appropriate picture but he laid his finger to the inappropriate one which is unusual to see." Doctor Boero said that a person guessing the answers totally at random should get 50 percent of the answers correct and that the defendant scored less than 50 percent. He explained that the defendant's poor performance on that test cast doubt on the score he obtained on the IQ test. Doctor Boero testified that the results of the TOMM test administered by Doctor Puente were "kind of meaningless" because Doctor Puente "aborted the test prematurely on all three trials." He said that aborting the test prematurely was not the "standard practice."

Doctor Boero testified that he administered a test specifically designed to gauge the defendant's ability to assist in his defense and that the defendant "demonstrated a clear self-serving motivation" during that test. He said that the defendant told him that "he would consider [pleading guilty] if it didn't entail too much jail time." The defendant also told Doctor Boero that "he would challenge a prosecution if he was found guilty if he felt there were mistakes in the process." The defendant was also careful to avoid making any incriminating statements to Doctor Boero. Doctor Boero said that the defendant was able to provide "a coherent and logical argument. It was very simplistic. In other words, it was just narrow." The defendant told Doctor Boero "that he would consult with his lawyer regarding the pros and cons of testifying in court, because he trusts her opinion." The defendant was able to identify the charged offenses, and he knew "that if he was found guilty that would include a long incarceration period." Doctor Boero said that the defendant "had a basic grasp of court decorum and procedure." The defendant "showed a very essential understanding . . . of the roles of . . . . the prosecuting attorney, the judge, his role. He was a little less clear about his own role and the role of the witnesses." Doctor Boero opined that, "with care and patience," the defendant "could help his attorney prepare a viable defense."

Doctor Boero clarified that the defendant did have "cognitive deficits" and that "his Spanish is fair" with some "expressive or receptive language issues." Doctor Boero admitted that there were times during the evaluation when the defendant was unable to comprehend the directions being given.

During cross-examination, Doctor Boero acknowledged that although he had performed "well over a hundred, close to two hundred" competency evaluations, he had not evaluated a native Spanish speaker with possible intellectual disability for competency. He

also admitted that he could not recall his meeting with the defendant very well and that the bulk of his testimony had been based upon his review of his own report. Doctor Boero said that having an English-speaking person conduct a psychological evaluation of a native Spanish speaker through an interpreter should be avoided when possible. He explained,

> Often untrained interpreters they . . . add to the questions and to the answers. They don't interpret the concepts or translate the concepts appropriately. They break the objectivity barriers, you know, they might befriend or they might alienate with non-verbal language or verbal communication the person that they're working for.
>
> There are nuances in speech and you need to be aware of the differences between countries and sensitive to those and be able to work through that.
>
> And primarily it's just to be very, very objective and clear and to not distort the information. Oftentimes in psychology minor things for a lay person may have significance.

He said that he had reviewed Doctor Brown's report for the evaluation conducted with an interpreter, and it was his opinion that there was "a skill issue" with the interpreter given that she did not notice the defendant's speech problem.

Doctor Boero agreed that people who suffer from intellectual disability tend to say that they understand even when they do not as a way to mask their lack of comprehension. Doctor Boero also agreed that the defendant's speech issue was more than a simple slur and that it suggested an issue with his learning of words. He stated that "the way [the defendant] expressed himself" during their conversations "suggests that his verbal skills were quite deficient, as well." He said that the defendant's thinking, particularly with regard to potential defenses, was "very concrete" and "either childish or sociopathic."

Doctor Boero admitted that the defendant did not entirely understand the role of his attorney and that he did not know what the jury was or what role the jury would play in a trial. He also conceded that the defendant was unclear as to the role of witnesses, saying that their "job is to say something about him." He said that the defendant indicated that he would defer to his attorney's suggestion whether he should testify at trial "because he trusts the work" of his attorney. He agreed that the decision whether to testify ultimately belonged to the defendant, but the defendant was "not thinking beyond that level." Doctor Boero noted that the defendant's inability to retain information imparted to him by his attorney was

-18-

"problematic." He acknowledged that the defendant's only legal strategy was to get out of jail as quickly as possible and that his answers to many of the questions during the evaluation were "truly simplistic, you know, very, very basic."

Doctor Boero testified during redirect examination that he did not diagnose the defendant as "mentally retarded" because "you can't diagnose mental retardation unless you have evidence of mental retardation before the age of eighteen years that's documented."

Doctor Kimberly Brown, who was deemed an expert in the field of forensic psychology, testified that she evaluated the defendant for competency in October 2011 using the services "of a court certified Spanish interpreter" who was a native Spanish speaker. Doctor Brown said that although the defendant "in the beginning of the interview seemed particularly shy and did not speak much," "[a]s the interview progressed he spoke more and seemed to be comfortable" with both Doctor Brown and the interpreter. Still, she said, he was not "forthcoming with information." Doctor Brown said that she did not repeat the tests administered by Doctor Boero because she did not speak Spanish. She said that she also "had concerns about the validity of any testing with [the defendant] based on his poor performance on the malingering measure of the TOM[M] that Dr. Boero gave." She explained that the defendant's scores on that test "were pretty clearly indicative of poor effort, you know, of someone who was not trying their best." Doctor Brown opined that the defendant was competent to stand trial, explaining,

> My opinion was that he was not putting forth adequate effort in responding to the competency related questions so that at face value his responses were not truly indicative of his actual abilities.

> But based on the totality of the information, including his prior functioning, including the information he presented to Dr. Boero and some of the information he discussed with me about his case, as well as the lack of evidence of mental retardation, the available evidence suggested that he should be competent to proceed in his case, and therefore I said that he was.

Doctor Brown said that the defendant's knowledge regarding the criminal trial process was inconsistent and that he did not appear to retain information that she tried to teach him regarding the process. She noted that the defendant was "at the lower end of intelligence" but that he had no "history such as organic problems or brain injury that would affect his memory." She recalled that the defendant knew that he had 15 charges and that he told her he believed he could spend as much as 25 years in prison if convicted. He could not,

however, articulate the specifics of the charges or differentiate between the charged offenses. The defendant told Doctor Brown that his attorney's job was to help him in his case but that she was not doing so. He also told Doctor Brown "that he requested his paperwork from his attorney." She noted, "Now, in my report I called this discovery. That's not the word that he used, that is my label for paperwork." The defendant told Doctor Brown that his attorney would not provide him with the paperwork because she was afraid the defendant would not understand it or that he would "share it with other people." The defendant said that his "paperwork" contained information from the victim's medical examination.

Doctor Brown testified that she asked the defendant about his reticence in speaking to Doctor Puente, and the defendant responded that he was "uncomfortable" speaking to Doctor Puente because "Dr. [P]uente indicated that he would be recording the evaluation." The defendant added that "his hesitation was based on Dr. [P]uente saying in a loud voice that . . . would he either like to cooperate or go to prison."

Doctor Brown said that when she asked the defendant how he could help his lawyer or what his defense might be, the defendant "said essentially that he's not guilty but that he was very concerned that nobody was going to believe him." He said that his attorney "had told him several times that they are going to bring the little girl in and she will testify against him" and that "[h]e didn't know why they would make up the lies." The defendant also told Doctor Brown that "he had been encouraging his lawyer to talk to the relatives of the girl because he thought they didn't have anything against him and could vouch for him." When she "asked him about plea bargaining as a possibility," the defendant told her "that there had been no offers in his case at that point."

Doctor Brown testified that "there were several pieces of information that were not consistent with [the defendant's] being so impaired that he would, for example, be mentally retarded." These "included his ability to work, manage his money, live independently, travel to this country, [and] function in jail without the jail being aware of his needing any special assistance." She explained that "at a certain range or level of mental retardation they are not able to go . . . undetected in the jail without people being aware, including the mental health staff in jail." Doctor Brown stated that "[o]n one [IQ] test by Dr. [P]uente [the defendant] obtained a score of sixty, but then there was a test that Dr. Boero gave him that was a forty-five. So clearly someone who is forty five . . . would be the person that . . . would not go undetected in jail." She maintained that an individual with an IQ of 45 "cannot live on their own. . . . They cannot work on their own. They cannot manage money for the most . . . part on their own. They certainly couldn't travel to a new country on their own." Doctor Brown noted that the defendant performed poorly when "asked some questions that the vast majority of mentally retarded people know the answer to."

-20-

Doctor Brown testified that the results of the tests conducted by Doctor Puente were suspect given Doctor Puente's testing method. For example, she said that she did not understand Doctor Puente's aborting the TOMM test, explaining, "The TOM[M] is not a test that you abort. There is no . . . procedure to stop the TOM[M]. I mean the TOM[M] is a test of effort . . . . I don't understand, nor is it consistent with the test manual or practice of administration, to stop the test after a certain time." Doctor Brown also noted that the defendant's score on another test went down over the course of three trials, which indicated that the defendant was "intentionally choosing the wrong answer. There just is no other logical explanation for this kind of pattern."

Doctor Brown testified that the defendant received a full scale IQ score of 60 on an intelligence test administered by Doctor Puente. She said that such a score "is an extremely low range" and that a score of 60 "would be consistent with someone with mild mental retardation." She stated, however, that she had no "confidence in the validity of the" intelligence test "based on [the defendant's performance] on the other test measures."

Doctor Brown acknowledged that performing a forensic evaluation via the use of an interpreter was "always a concern," but she was comfortable with the particular interpreter who helped during the defendant's evaluation because "she was a native Spanish speaker" and because "she interpreted both pauses, inflections and choice of words." Doctor Brown stated that "Dr. Boero's evaluation is probably a better evaluation because he's Spanish speaking."

During cross-examination, Doctor Brown testified that the interpreter that she used during the evaluation specifically said that the defendant had no issue with his speech, but she conceded that both Doctor Boero and Doctor Puente noted that the defendant did have such an issue. Doctor Brown also acknowledged that she had been told by defense counsel, who spoke Spanish, that the defendant had a speech problem.

Doctor Brown conceded that it was possible that the defendant was intimidated by the testers, particularly Doctor Puente. She also conceded that the defendant had "a shy, reticent personality." She stated, however, that it was her opinion that the defendant was "trying to appear he's knowing less than he really does." Doctor Brown testified that another evaluation of the defendant's competency was unnecessary because the defendant "doesn't have any conditions that are affecting his competency that fluctuate or change with time." She added, "A new assessment would only have value if he was going to be fully cooperative. And thus far I don't have any information to suggest that, at least in terms of interactions with the evaluators. In fact, he's becoming less cooperative." She said that although she "couldn't specifically tell . . . what [the defendant's] IQ category is," she felt

"quite confident that it's not mentally retarded. It's above mentally retarded."[3] She also explained, "[P]eople can be mentally retarded and can be competent, people can be mentally retarded and can be incompetent. However, if someone is not mentally retarded, it's almost never that they would be incompetent due to the deficit in understanding or knowledge." Doctor Brown reiterated that she did not believe the defendant to be "mentally retarded" because he had "managed money, that he has lived independently, that he's come to this country on his own, that he doesn't have the level of adaptive functioning that would be indicative of - nor do we have any indication that he has mental retardation."

Doctor Brown stated that when she talked to the defendant about his "paperwork," she was not aware that a copy of all the discovery materials, translated into Spanish, had been provided to the defendant "many months" before. She agreed that, if the defendant already had a copy of the discovery materials, it was odd that he should say that his attorney had refused to provide it to him. She also agreed that it was "maybe paranoid" that the defendant believed that Doctor Puente had an audio recording of the evaluation conducted by Doctor Boero.

At the conclusion of the hearing, the trial court took the matter under advisement.[4] In a written order, the court found that "[a]lthough the defendant attempted to

---

[3]In *Coleman v. State*, our supreme court, interpreting Code section 39-13-203, held that an expert expressing an opinion whether a criminal defendant's IQ renders him intellectually disabled must do so "specifically" by providing a single numerical score or by stating that the defendant's IQ is "'seventy (70) or below' or is above 70." *Coleman v. State*, 341 S.W.3d 221, 242 (Tenn. 2011). Recently, however, the United States Supreme Court rejected the use of a fixed number when using IQ to determine intellectual disability, observing, "For purposes of most IQ tests, . . . an individual's score is best understood as a range of scores on either side of the recorded score." *Freddie Hall*, slip op. at 11. The Court explained, "A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence." *Id.* Interestingly, the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), has removed IQ from the diagnostic criteria for intellectual disability specifically because IQ score was being "overemphasized as the defining factor of a person's overall ability, without adequately considering functioning levels. This is especially important in forensic cases." American Psychiatric Association, *Intellectual Disability Fact Sheet* (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013)). Despite that the DSM-V has removed IQ score from the diagnostic criteria for intellectual disability, the DSM-5 states IQ score should be part of an overall assessment for intellectual disability and that intellectual disability "is considered to be approximately two standard deviations or more below the population, which equals a score of about 70 or below." *Id.*

[4]At this juncture, we note our concern that the trial judge may have brought to bear the judge's own specialized knowledge when evaluating the defendant's competence to stand trial. When taking the defendant's motion under advisement, the judge stated:

(continued...)

-22-

malinger with Dr. Brown, the defendant is knowledgeable about the charges against him as

[4](...continued)
> Well, I am going to look at this matter, but periodically I do have to point out that my background is in Psychology. I have a Bachelors and Masters degree in Psychology. I was trained as a psychological examiner.
>
> I was a counselor for adults and children for a number of years before I went to law school, so I have some basic knowledge of evaluations of individuals and their mental health status.
>
> I take all of it into account when I look at these matters and I will do so in [the defendant's] case and I will issue a ruling on this matter.

The trial court's personal knowledge and experience were irrelevant to the determination of the defendant's competency. To be sure, the trier of fact may take into account matters that are of common knowledge to every person, but "neither jurors nor judges . . . are permitted to base their decisions on the existence or nonexistence of facts according to their personal beliefs or experiences." *Fairbanks v. State*, 508 S.W.2d 67, 69 (Tenn. 1974); *see also Archie Scott v. Dickson Insurance Agency*, No. 01-A-01-9002-CV-00057 (Tenn. Ct. App., Nashville, Aug. 10, 1990) (stating that the "trial court erred in taking into account his personal experience" because "'[j]udicial knowledge'" was "not personal knowledge of the judge but the cognizance of certain facts which the judge may take or act upon without proof because the facts are universally known"). Our supreme court has explained,

> There is ample authority for the proposition that a judge is not to use from the bench, under the guise of judicial knowledge, that which he knows only as an individual observer outside of the judicial proceedings. Judicial knowledge upon which a decision may be based is not the personal knowledge of the judge, but the cognizance of certain facts the judge becomes aware of by virtue of the legal procedures in which he plays a neutral role. No judge is at liberty to take into account personal knowledge which he possesses when deciding upon an issue submitted by the parties. In other words, "[i]t matters not what is known to the judge personally if it is not known to him in his official capacity."

*Vaughn v. Shelby Williams of Tenn., Inc.*, 813 S.W.2d 132, 133 (Tenn. 1991) (citations omitted).

It is only because the trial judge did not make specific reference to the application of his own personal specialized knowledge in the order declaring the defendant competent that we do not reverse and remand the case for a new declaration of competence free of the influence of the trial court's prior experience as a psychologist. As the court of appeals has observed, "It is not always the best practice for a Trial Judge to comment freely upon the details of the evidence heard. However, when this occurs, the correctness of the judgment reached is judged upon the result reached, rather than the explanatory comments of the Trial Judge." *Gotwald v. Gotwald*, 768 S.W.2d 689, 695 (Tenn. Ct. App. 1988) (citations omitted).

well as the role of his attorney and the judge." The court also accredited Doctor Brown's testimony that "the defendant was able to indicate . . . that he needed his paperwork from his attorney so that he could know for himself what they were accusing him of doing" and that the defendant "was able to communicate . . . that his attorney was refusing to give it to him." The court ultimately concluded "that the defendant is able to communicate with his attorney, understand the nature of the charges against him as well as the legal process" and deemed the defendant "competent to stand trial."

The defendant contends that the evidence preponderates against the trial court's finding, claiming that "[t]he testimony and report of the mental health professionals who testified at the hearings demonstrated that the defendant did not have the capacity to understand the nature and object of the proceedings against him, to consult with counsel, or to assist in preparing his defense." The defendant points to Doctor Puente's conclusion that the defendant was "illiterate, mentally retarded and brain damaged" and to Doctor Boero's testimony that the defendant's "cognitive impairments" and inability to "describe legal proceedings" as proof of the defendant's incompetence. The State points to testimony by both Doctor Boero and Doctor Brown that the defendant was malingering and that his being intellectually disabled was irreconcilable with his being able to travel to the United States alone, maintain employment, manage his finances, and live independently.

In our view, the evidence does not preponderate against the findings of the trial court. Although both Doctor Puente and Doctor Boero testified that the defendant had a low IQ and cognitive impairments, Doctors Brown and Boero testified that the defendant was malingering and that his IQ was not as low as demonstrated during testing. Importantly, both Doctor Brown and Doctor Boero testified that the defendant had at least a rudimentary understanding of the charges against him, the roles of the parties, and the role of the judge. Both also testified that the defendant had some understanding of plea bargaining and at least some familiarity of the concept of discovery. They noted that, with care, the defendant could assist his attorneys in his own defense.

*II. Motion to Suppress Pretrial Statement*

The defendant next contends that the trial court erred by refusing to suppress his pretrial statement to the police on grounds that the statement was not voluntarily given. Acknowledging that the officers provided the defendant with *Miranda* warnings in Spanish, the defendant nevertheless argues that he did not knowingly waive his constitutional rights because the translation "was nonsensical" and because he lacked the cognitive capacity and background to understand the warnings. The defendant also contends that his statement was the product of police coercion, claiming that the officers "misled the defendant as to the purpose and possible use of any statements he made." The State concedes, as it did at the

-24-

suppression hearing, that the defendant was in custody when he provided the statement and that the evidence preponderates against the trial court's finding otherwise but avers that the defendant voluntarily and intelligently waived his constitutional rights after being provided accurate *Miranda* warnings and that his statement was voluntarily given and was not the product of coercion.

## *A. Proof*

### *Detective Fitzgerald's Testimony*

At the suppression hearing, Detective Fitzgerald testified that after the victim's father's unsuccessful attempt to extract a recorded confession from the defendant, the defendant left the residence he shared with the victim's family and was immediately intercepted by Detective Fitzgerald and Officer Ramirez. He said that Officer Ramirez, who spoke Spanish, asked the defendant "if he would mind coming down to talk with us" and that the defendant agreed to accompany the officers to the police station. Detective Fitzgerald said that Officer Ramirez transported the defendant in Officer Ramirez's patrol car.

During the interview, Detective Fitzgerald posed the questions and Officer Ramirez acted as a translator. Detective Fitzgerald testified that Officer Ramirez provided the defendant with *Miranda* warnings in Spanish and that the defendant was provided with a waiver of rights form that was written in Spanish. He said that the defendant stated that he understood his constitutional rights and that the defendant agreed to waive his rights. He added that the defendant appeared to read the rights waiver form before signing it. Detective Fitzgerald, who did not speak Spanish, said that the defendant was responsive to his questions and did not appear to be confused. Detective Fitzgerald denied making any promises to the defendant in exchange for his statement. Detective Fitzgerald said that he did not dispute the translation of the recorded interview.

At trial, Detective Fitzgerald testified that after the victim's father's failed attempt to obtain a recorded confession from the defendant, he and Officer Ramirez intercepted the defendant outside the family's residence.[5] He explained that he had instructed the victim's father "that if he wasn't able to get anything just to ask [the defendant] . . . to leave the residence" and that he and Officer Ramirez "waited outside for [the defendant] to

---

[5]"[A]ppellate courts, when evaluating the correctness of the ruling by the trial court on a motion to suppress, may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012) (citing *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *State v. Chopin*, 372 So. 2d 1222, 1223-24 n.2 (La. 1979); *State v. Bruno*, 595 A.2d 272, 273 (Vt. 1991); Wayne R. LaFave, *Search and Seizure* § 11.7(d) (4th ed. 2004)).

come outside." He said that Officer Ramirez explained to the defendant who they were and "that [they] needed to speak with him. And asked him, if it was okay, if he would come down to our office and talk with us." The defendant agreed, and Officer Ramirez transported the defendant in the back of his patrol car.

Detective Fitzgerald admitted that Officer Ramirez did not translate the *Miranda* warnings "word-for-word." He also admitted that when first asked if he understood his constitutional rights the defendant did not say yes but said "Mm-mm" and nodded his head. He conceded that the defendant, an immigrant from Honduras with only six year's schooling, did not provide any incriminating information until after Officer Ramirez told the defendant that his conduct was not a big deal and that he would not get into any trouble. He acknowledged that Officer Ramirez told the defendant that they were not accusing the defendant of a crime but simply wanted to know the truth about his relationship with the victim. Detective Fitzgerald conceded that these statements to the defendant were lies.

Detective Fitzgerald acknowledged that he attempted "to minimize what the offense is and . . . present it in a light that it's not as serious as someone would think it might be" in order to make the defendant "feel more comfortable" and "open up a little bit more." He also conceded that he promised the defendant that he would not relay any of the defendant's admissions to the victim's parents. He said that he was not attempting to coerce the defendant but wanted to "[m]ake him feel at ease and talk about it."

*Doctor Puente's Testimony*

In addition to providing testimony about the defendant's competence to stand trial, Doctor Puente provided testimony about the defendant's capacity to understand and voluntarily waive his constitutional rights and about the defendant's ability to provide a voluntary confession. Not only did Doctor Puente conclude that the defendant was intellectually disabled and that his disability rendered him incompetent to stand trial, Doctor Puente concluded that the defendant's disability and cultural background prevented him from understanding and voluntarily waiving his constitutional rights. Doctor Puente stated that the defendant's intellectual disability hampered his ability to understand the *Miranda* warnings, as did his lack of education. He added that the translation of those warnings by Officer Ramirez also interfered with the defendant's ability to understand his constitutional rights and voluntarily relinquish them. He said, "As far as I could tell, the Spanish that was used was Spanglish. . . . I had a hard time understanding that Spanglish. I think if I had a hard time understanding Spanglish, I suspect that [the defendant] would have as well."

Doctor Puente, who had special expertise in evaluating natives of Central America, said that in the defendant's native Honduras, "there's a deference to authority" that

-26-

does not exist in the United States. Additionally, because the defendant was not from the United States, he would not be familiar with the concept of a constitutional right to remain silent. Doctor Puente explained that he did "not know any country that [provides a constitutional right to remain silent] in Central America." He said that, as a result, the defendant would have believed himself obligated to speak to the police.

Doctor Puente testified that there also existed "a misunderstanding of an issue that is important." He explained, "Si, in response to a question or statement does not necessarily mean 'I understand.' It means 'I acknowledge your comment, not that I understand your comment.'"

*Doctor Boero's Testimony*

Doctor Boero was not asked to opine on the defendant's capacity to waive his constitutional rights, but his testimony regarding the defendant's mental capacity and level of functioning is relevant to our discussion. Doctor Boero testified that the defendant had "cognitive deficits" and "expressive or receptive language issues." He stated that testing indicated that the defendant's full-scale IQ was 45, but he added that such a score was inconsistent with the defendant's level of functioning. He also added that the defendant's performance on other tests indicated that the defendant was malingering. Nevertheless, Doctor Boero noted that there were times during his evaluation of the defendant that the defendant did not appear to understand Doctor Boero's instructions. Noting the defendant's low level of functioning, Doctor Boero explained, "You know, someone has a very low level of education and they have some cognitive impairments, then you have to simplify, you know, the way you express things, or rephrase them so that the person can understand them better." Doctor Boero noted that he "didn't evaluate [the defendant] for literacy," but he observed that the defendant could read and write some rudimentary words and phrases. Doctor Boero also observed that the defendant's "verbal skills were quite deficient." Additionally, the defendant provided "truly simplistic" and "very, very basic" answers to questions regarding the role of the participants in a criminal trial. Doctor Boero stated that he did not diagnose the defendant as intellectually disabled because he had no evidence of the defendant's level of functioning before he turned 18.

*Doctor Brown's Testimony*

Doctor Brown opined that the defendant was not intellectually disabled but acknowledged that he was "at the lower end of intelligence" and that "he did not complete much schooling." She noted that a full-scale IQ score of 45 was inconsistent with the defendant's demonstrated level of functioning. Doctor Brown also noted that she had little confidence in the IQ scores obtained by Doctors Puente and Boero given the evidence that

the defendant was malingering. She made it clear, however, that she had not performed any testing to discern the defendant's IQ and that she did not know what his IQ might be, saying, "I feel quite confident that it's not mentally retarded. It's above mentally retarded, but where above, I don't know."

*Officer Ramirez's Testimony*

Officer Ramirez did not testify at the suppression hearing. Officer Ramirez testified at trial that there were times during his interview with the defendant that the defendant "was a little puzzled" and that when he noticed the defendant's looking puzzled, he would take the time to explain and ensure that the defendant understood. Officer Ramirez agreed that the translation of the interview from Spanish into English was accurate. During cross-examination, Officer Ramirez said that he tried to put himself on the defendant's educational level when explaining the *Miranda* warnings.

*Interview*

The video recording of the defendant's interview was exhibited to the suppression hearing and played for the jury at trial. The parties agreed on a translation of the recording, which was provided to the jury as a guide and later entered as an exhibit at trial. That translation includes the following exchange, including Officer Ramirez's recitation of the *Miranda* warnings[6]:

> Officer 2    He's going to give you a ducument [sic] there that's in Spanish, and that ducument [sic] is about your rights, and if you don't understand your rights you let me know and I'll explain to you I'm going to tell you [unintelligible] at the same time what is written here and if you understand your rights you just have to put "Yes, I understand my rights". I just need your signature here, he signs here, I sign here as a witness, the date and everything, eh, and after, the, the, you have to put your name, the address where you are living now, your telephone, where you work and date of birth, and that's all. OK?
>
> Hernández    Ah hah

---

[6]The brackets and italics are exactly as they appear in the transcript.

| | |
|---|---|
| Officer 2 | So, this is in Spanish [hands paper to Hernández] and you can read this, and I'm going to say it in voice [sic]. Those rights of yours, you have the right to remain in silence. Anything you say can be used against you in the court of law. You have the right to have a lawyer and if you can't hire or pay for a lawyer the state gives you a public lawyer to present with you in all the time he is talking with you. |
| Officer 2 | At any moment that you don't want to continue talking with us with that lawyer present you can sto . . . stop and not. You know, stop? |
| Hernández | Yes |
| Officer 2 | . . . and then we end up talking [sic]. |
| Hernández | Mm hm |
| Officer 2 | Understanding these rights, are you . . .are you willing to continue talking with us about of the situation? Yes or no? |
| Hernández | Yes |
| Officer 2 | I just need you to mark there, "Yes", that you understand your rights, on the little paper there. Did you 'derstand? |
| Hernández | Mm. |
| Officer 1 | *He said yes?* |
| Officer 2 | *Yes*<br>[Officer 1 gestures to a place on the paper] |
| Officer 2 | Mark there, "Yes"<br>[Pause] |

Officer 1     *And then his signature* [points to another place on the paper]

Officer 2     And your signature

Officer 2     OK, if you have doubt of what I told you, it's there written in Spanish, if you want to read. . . with pleasure.

Officer 1     *I'll fill all that out after . . .*

Officer 2     He says he signs all that. . .

     . . . .

Officer 2     You understood your rights, correct?

Hernández     Yes

Officer 1     *Is he sure?*

Officer 2     For sure?

Officer 1     *You sure he's. . . you sure you understand all this?*

Officer 2     Um, you understand all this?

Hernández     Yes

Officer 2     Did you understand your rights?

Hernández     [unintelligible]

Officer 2     *He said okey. He said yes.*

The defendant did not testify at either the suppression hearing or at trial.

In a written order, the trial court concluded that "under the totality of the circumstances that the defendant's statements were not 'compelled' as the result of psychological coercion and were not induced by an implied promise of leniency." The court found

> that the defendant was free to leave at any time; the defendant was only arrested after he had given incriminating statements in the interview; the defendant was of average intelligence with the ability to read, write and comprehend the questions being asked of him; the defendant voluntarily answered those questions.

## B. Recitation and Application of Law

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the

defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[7] Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544-45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that Miranda rights have been waived.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545).

> When the voluntariness of a statement given to police is challenged based on the defendant's competency to waive the rights provided by *Miranda*, the determinative issue is "whether the defendant had the capacity in the first place to form a will of his own and to reject the will of others."

*Thacker*, 164 S.W.3d at 249 (quoting *State v. Benton*, 759 S.W.2d 427, 431 (Tenn. Crim.

---

[7]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

App. 1988)).

Discussing the capacity of intellectually disabled suspects to knowingly and intelligently waive their rights after being provided *Miranda* warnings, our supreme court observed that "[m]entally retarded individuals present additional challenges for the courts because they may be less likely to understand the implications of a waiver." *Blackstock*, 19 S.W.3d at 208 (citing *United States v. Murgas*, 967 F. Supp. 695, 706 (N.D.N.Y. 1997)). The court explained,

> Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] so waive, the constitutional rights embraced in the Miranda rubric." Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.

*Blackstock*, 19 S.W.3d at 208 (quoting *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)) (alteration in *Blackstock*). The State bears the burden of demonstrating, via the totality of the circumstances, that the defendant "had a meaningful awareness of his *Miranda* rights, as well as the consequences of waiving his rights." *Blackstock*, 19 S.W.3d at 209 (citing *Stephenson*, 878 S.W.2d at 544-45).

We begin our analysis by accepting the State's concession and concluding that, despite the trial court's finding to the contrary, the defendant was in custody at the time he gave the statement at issue.

> [T]he test for determining whether a person is in custody so as to be entitled to the warnings required by *Miranda* is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself

-33-

deprived of freedom of movement to a degree associated with a formal arrest."

*State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996), and citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). Relevant to the determination of this issue are:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Anderson*, 937 S.W.2d at 855.

In this case, Detective Fitzgerald and Officer Ramirez stopped the defendant as he exited the residence he shared with the victim's family following the victim's father's failed attempt to elicit a confession from the defendant and asked him to accompany them to the police station for questioning. The defendant then traveled to the police station in the back of Officer Ramirez's patrol car. Detective Fitzgerald testified at trial that the defendant was taken into custody when he left the residence after being asked to leave by the defendant's father. The video recording of the interview shows that when he arrived at the police station, the defendant was handcuffed and left waiting in a small interview room. When the officers entered the room, they blocked the defendant's path to the door. Although the officers later removed the handcuffs and told the defendant that he was free to leave, we cannot say that a reasonable person in the same situation would actually feel free to leave. *See State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001) (holding that offender who voluntarily agreed to accompany police was in custody when he was "confined in the backseat of a patrol car with two other officers present" and handcuffed during the interrogation).

Having concluded that the defendant was in custody when questioned by the police, we must next determine whether the defendant gave his statement in contravention

-34-

of his constitutional rights. Because the test for voluntariness is the same regardless of whether the defendant was provided with *Miranda* warnings, *see Smith*, 933 S.W.2d at 455, and because the question whether the defendant voluntarily provided a statement to the police is inextricably linked with the question whether the defendant voluntarily waived his constitutional right to remain silent by providing a statement after the warnings were given, we will consider those issues together to determine whether, under the totality of the circumstances, the defendant's statement was freely and voluntarily given after a knowing and intelligent waiver of his constitutional rights.

As indicated, to determine whether the defendant knowingly and intelligently waived his constitutional rights, we must consider "the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained." *Blackstock*, 19 S.W.3d at 208.

Here, the defendant equivocated regarding his age during the police interview and his evaluation by Doctor Puente, but it appears from the record that he was born on September 21, 1981, making him 29 years old at the time of the interview. From the personal history obtained by Doctors Puente and Boero, we learn that the defendant emigrated from Honduras sometime after he turned 15. Doctor Puente testified that Hondurans, by virtue of their culture and the nature of their government, are deferential to authority and would be unaware of any right to remain silent in the face of police questioning.

Although there was evidence that the defendant held a steady job and managed his own finances, he spoke no English. Additionally, all three experts agreed that the defendant's ability to read and write was limited. The defendant told Doctors Boero and Puente and Officer Ramirez that he had only six years of formal education while living in Honduras. All three expert witnesses agreed that the defendant's intellectual functioning was at a very low level, and the defendant received scores of 45 and 60 on the two IQ tests given during his competency evaluations. Doctors Boero and Brown, however, testified that the defendant was malingering to some extent. Only Doctor Brown, who did not perform any testing of the defendant and conducted her evaluation via an interpreter, expressed an opinion that the defendant's IQ was above the intellectually disabled range. Certainly, no testimony supported the trial court's finding that the defendant was "of average intelligence."

No proof suggested that the defendant had any prior experience with the criminal justice system. In addition, the defendant seemed nonplussed to find himself in the police station being questioned by police.

To be sure, the *Miranda* warnings as translated into Spanish by Officer

Ramirez were not a word-for-word recitation of the warnings traditionally given in English. Indeed, Doctor Puente characterized the translation as "Spanglish." We conclude, however, that Officer Ramirez's translation, while less than cogent, would have been sufficient to convey the constitutional rights to remain silent and to the assistance of an attorney during questioning to a person of average understanding. The record is clear, however, that the defendant was not a person of ordinary intelligence or average understanding.

At the beginning of the police interview, the defendant appears reticent, answering primarily in single-word or single-syllable answers. As was noted during the testimony and as the State concedes, at some points during the interrogation, the defendant appears puzzled and at others, afraid. Moreover, the officers made numerous efforts to minimize the defendant's culpability, notably telling him that the goal of the interview was so that "the relationship that [the defendant had with the victim] can end and have it as a friendship" and that the officers simply wanted "to know how [they could] solve this problem, so that it doesn't happen anymore."

Having examined the factors given to us by our supreme court, we conclude that the evidence preponderates against the findings of the trial court. No proof supports that court's findings that "the defendant was free to leave at any time," that "the defendant was of average intelligence," or that the defendant had the ability to read and write. Instead, the record demonstrates that the defendant was in custody when questioned by Detective Fitzgerald and Officer Ramirez, that the defendant functioned at a low level intellectually, that the defendant spoke no English and had only a limited ability to read and write, that the defendant emigrated from a country where the type of constitutional protections afforded to Americans do not exist, that Officer Ramirez's translation of the *Miranda* warnings was not sufficient to convey to a person of the defendant's understanding the consequences of relinquishing those constitutional rights, and that the officers obfuscated their reasons for questioning the defendant. Thus, under the totality of the narrow set of circumstances presented in this case, we cannot conclude that the defendant effected a voluntary, knowing, and intelligent waiver of his constitutional rights or that his statement was voluntarily given. In consequence, the trial court erred by refusing to suppress the statement.

*Harmless Error*

Having concluded that the trial court erred by refusing to suppress the defendant's statement, we must next determine whether the admission of his unconstitutionally obtained statement at trial was harmless beyond a reasonable doubt. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (applying harmless error analysis to coerced confessions if the court determines the error is harmless beyond a reasonable doubt); *Chapman v. California*, 386 U.S. 18, 24 (1967).

In our view, the proof of the defendant's guilt on the conviction offenses was more than sufficient even in the absence of his statement, which was somewhat vague and self-serving. Additionally, on those counts for which the only proof adduced was the defendant's own statement, the jury found the defendant not guilty, indicating the jury's ability to closely parse the proof presented at trial. As a result, we have no trouble concluding that the erroneous admission of the statement was harmless beyond a reasonable doubt.

### III. Suppression of DNA Evidence

The defendant next contends that the trial court should have suppressed the results of DNA testing conducted using DNA obtained from the defendant at the conclusion of his interrogation because the defendant did not voluntarily consent to provide his DNA for testing. The State contends that the trial court did not err because the results of the testing were admissible even in the absence of the defendant's voluntary consent.

Prior to trial, the defendant filed a motion seeking to exclude the results of DNA testing that was conducted using DNA samples obtained from the defendant shortly after his arrest on grounds that the defendant did not voluntarily consent to giving the sample. The defendant argued that the defendant's consent was not voluntary because the consent to search form was not written in Spanish and was poorly translated by Officer Ramirez. He provided the following translation, and the parties agreed to its accuracy:

> Here it is saying, I, Pedro Hernandez, is informed your rights. OK? Y'understanding [sic] your rights, when are giving us a test. OK? Without an order, you are giving him permission, what's his name, Eric Fernandez. . . . let's see, Fritzgerald, Eric Fritzgerald, to, eh, he is a policeman, is one. . . is a detective of the police of Metro, Department of Nashville, and of the County of Davidson and the State of Tennessee, is abligated [sic] to make a test. . . so as to give a test, a [non-word] about of the hairs, blood, "simen", of the nails, and of saliva. OK? You 'derstand and you know, knowing that, you are tend. . . you are tending that you are stopping all you rights, and to us you are . . . and we are not promisying [sic] you or we are not thataning [sic] you saying that you have to give us a test. That you are doing this voluntarily. OK? Are you 'derstanding? OK. And, and just like this is saying here that you are giving pe . . . are informing your rights. OK? And you are giving a [non-word], a [non-word] of him of your saliva and since he is a Metro

policeman and all that, he is not abligating [sic] you to give you
something, neither did he not promise you anything, neither, for
you to giving a test of your saliva. OK?

At the hearing on the defendant's motion, the defendant argued that he could
not have provided informed consent given the poor translation of the consent to search form.
The State argued that, should the trial court suppress the evidence, the only result would be
a delay in the trial because the defendant's DNA was lawfully obtained following his arrest,
was available for testing, and would presumably render the same result. The State urged the
trial court to deem the evidence admissible under the inevitable discovery doctrine. The trial
court agreed that Officer Ramirez's translation of the consent to search form was
"nonsensical" and stated, "I don't think he could have possibly given informed consent,
given these circumstances." The trial court took the motion under advisement and, in an
order issued via electronic mail, denied the motion, ruling, "The suppression motion is
respectfully denied based on the totality of the circumstances. He signed a consent form, and
he never protested. Moreover, he was arrested and another sample was taken but not
analyzed. If suppressed it would only delay the inevitable."

Now on appeal, the defendant contends that the trial court erred by refusing to
suppress the results because the poor translation of the consent to search form rendered his
consent invalid. The State disavows the trial court's ruling regarding the validity of the
defendant's consent but argues that the trial court did not err by refusing to suppress the
evidence under both the inevitable discovery and independent source doctrines.

Again, a trial court's factual findings on a motion to suppress are conclusive
on appeal unless the evidence preponderates against them. *See Binette*, 33 S.W.3d at 217.
Questions of credibility, the weight and value of the evidence, and the resolution of
conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial
court's findings of fact unless the evidence in the record preponderates against them. *Odom*,
928 S.W.2d at 23. We review the application of the law to the facts, however, de novo on
appeal. *Keith*, 978 S.W.2d at 864.

As we did with regard to the defendant's custody status during his
interrogation, we accept the State's concession and hold that the evidence preponderates
against the trial court's holding that the defendant validly consented to the taking of the DNA
sample. Officer Ramirez's translation is, as the trial court initially found, nonsensical. The
translation was certainly insufficient to convey to the defendant his right to refuse the
officers. That the Spanish-speaking defendant signed a form printed in English is of
absolutely no consequence given the poor translation of that form by Officer Ramirez. Nor
is the defendant's failure to physically protest the taking of the sample sufficient to render

his consent knowingly and voluntarily given.

"Generally, evidence obtained as a direct or indirect result of unconstitutional police conduct will be excluded as the 'fruit' of the primary constitutional breach." *State v. Hill*, 333 S.W.3d 106, 122-23 (Tenn. Crim. App. 2010) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). "Under the doctrine of 'inevitable discovery,' however, illegally obtained evidence will be deemed admissible at trial if the State can establish that the evidence would have inevitably been discovered by lawful means." *Hill*, 333 S.W.3d at 123 (citing *State v. Patton*, 898 S.W.2d 732, 735 (Tenn. Crim. App. 1994)).

> Before the inevitable discovery doctrine will permit the admission of illegally obtained evidence, the State must demonstrate "first, that certain proper and predictable investigatory procedures would have been utilized in the case at bar, and second, that those procedures would have inevitably resulted in the discovery of the evidence in question."

*Hill*, 333 S.W.3d at 123 (quoting *State v. Coury*, 657 S.W.2d 777, 780 (Tenn. Crim. App. 1983)). "Proof of inevitable discovery may involve 'no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment.'" *Hill*, 333 S.W.3d at 123 (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984), and citing *State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003)).

The Supreme court adopted and applied the inevitable discovery doctrine in *Nix*. In that case, Nix abducted 10-year-old Pamela Powers from a Des Moines, Iowa YMCA on Christmas Eve in 1968 and later turned himself in to authorities in Davenport, Iowa. *Nix*, 467 U.S. at 434-35. While transporting Nix via car from Davenport to Des Moines, officers initiated a conversation with Nix that elicited from him incriminating statements and ended with his guiding the police to the victim's body. *Id.* at 435-36. The trial court deemed Nix's statements inadmissible but allowed the prosecution to offer evidence concerning the location and condition of the body under the theory that had the search for the victim continued, the body would have been discovered within a short time and in the same condition as actually found. *Id.* at 437-40.

In support of the application of the inevitable discovery doctrine, the *Nix* prosecution offered specific evidence that the volunteer search team assembled to search for the victim had ended its search only two and one-half miles from the location of the body after the defendant identified the location and that, based on the earlier progress of the search, the victim's body would have been discovered in an additional three to five hours of

continued searching. *Id.* at 449.

> "On this record," the Supreme Court concluded, "it is clear that the search parties were approaching the actual location of the body, and we are satisfied, along with three courts earlier, that the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found."

*Hill*, 333 S.W.3d at 123-24 (quoting *Nix*, 467 U.S. at 449-50). To warrant application of the inevitable discovery doctrine, the State must present "demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5.

In addition to the doctrine of inevitable discovery, "it has long been recognized that evidence obtained by means genuinely independent of the constitutional violation is not subject to the exclusionary rule." *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992) (citing *Wong Sun*, 371 U.S. at 487; *Silverthorne*, 251 U.S. at 392). "Pursuant to the independent source doctrine, an unlawful entry does not mandate the suppression of evidence located inside a residence if the evidence is subsequently discovered following the execution of a valid warrant based upon facts independent and separate from information discovered as a result of the unlawful entry." *State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005) (citing *Clark*, 844 S.W.2d at 600). "The underlying policy of the independent source doctrine is that 'while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied.'" *Carter*, 160 S.W.3d at 532 (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). "In order for the subsequent warrant and search to be found genuinely independent of the prior unconstitutional entry, . . . information obtained during the illegal entry may not have been presented to the issuing Magistrate." *Clark*, 844 S.W.2d at 597 (citing *Murray*, 487 U.S. at 542).

In this case, the evidence established that just after informing the defendant that he was under arrest, the following exchange occurred:

> Officer 1      *Yeah. OK. Uh, explain to him that . . .I would like to get a cheek swab from him.*
>
> Officer 2      He would like to get a . . . a test of you saliva inside your mouth. OK?
>
>      . . . .

Officer 2      Are you OK with that?

Officer 1      *Is he?*

Officer 2      You know that I am talking to you, right?

Hernández    Yes

Officer 2      It's a saliva test, so we have to . . . take a sample.

Officer Ramirez then read the consent to search form to the defendant as quoted above. The defendant signed the form and provided the sample. At the hearing on the defendant's motion, the prosecutor stated that, upon his arrival at the jail following his arrest, a blood sample was obtained from the defendant for the purpose of HIV testing. The prosecutor also noted that Code section 40-35-321 required the defendant to submit a buccal swab upon his arrest for rape of a child. Finally, the prosecutor noted that the State had obtained a new buccal swab DNA sample from the defendant on the morning of the hearing via a search warrant. The prosecutor noted that because other samples were available for testing and because the defendant's DNA would not change, the challenged DNA results would independently be discovered upon retesting. She noted that the only practical effect of the court's suppressing the evidence would be a delay in the trial.

In our view, the record supports admission of the DNA test results under the independent source doctrine. The State obtained, via a lawfully issued warrant, a second buccal swab DNA sample from the defendant. DNA is unique to every human being, save identical twins, and its composition does not change over time. *See State v. Begley*, 956 S.W.2d 471, 473 (Tenn. 1997) (citing *State v. Cauthron*, 846 P.2d 502, 508 (Wash. 1993) ("Each individual, with the exception of identical twins, has a unique DNA structure which is contained in every nucleated cell. That structure remains constant throughout a human lifetime.")). Presumably, then, testing conducted utilizing the legally obtained DNA would render the same results as testing conducted utilizing the illegally obtained sample. Thus, because the evidence was available via a genuinely independent source, the trial court did not err by denying the defendant's motion to suppress the DNA evidence.

*IV. Testimony Regarding Photograph*

The defendant asserts that the trial court erred by permitting the victim to testify in violation of Tennessee Rule of Evidence 404(b) that the defendant had shown her a photograph of his genitalia. The State concedes that the trial court erred by admitting this

evidence but argues that the error was harmless in light of the overwhelming proof of the defendant's guilt.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005).

Notwithstanding the general rule, evidence of a defendant's prior crimes, wrongs, or acts may be admissible when it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a defendant's character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of "motive and common scheme or plan" to establish identity; (2) to establish the defendant's intent in committing the offense at trial; and (3) to "rebut a claim of mistake or accident if asserted as a defense." *Thacker*, 164 S.W.3d at 239 (citing *State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996)). To admit such evidence, the rule specifies three prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear and convincing evidence that the defendant committed the other crime or bad act. *Id.*, Advisory Comm'n Comments; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997); *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

In reviewing a trial court's decision to admit or exclude evidence under Rule 404, an appellate court may disturb the trial court's ruling only if there has been an abuse of discretion. *Thacker*, 164 S.W.3d at 240. The trial court's determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b).

*See DuBose*, 953 S.W.2d at 652. If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

The defendant filed a pretrial motion to exclude any testimony from the victim that the defendant had shown her a photograph of his genitalia on his cellular telephone. At the pretrial hearing, the prosecutor, citing *State v. Rickman*, 876 S.W.2d 824 (Tenn. 1994), and *State v. Daniel Pottebaum*, No. M2007-02108-CCA-R3-CD (Tenn. Crim. App., Nashville, Dec. 30, 2008), argued that the victim's testimony would be admissible because "the victim is allowed to testify to unindicted conduct that occurs inside the indictment time period" and that the defendant's showing the photograph to the victim was "part of the grooming process and occurring during the time period of the indictment." The State also argued that the defendant's display of the photograph was "proof of his desire to commit these offenses for his sexual gratification." Following this argument, the trial court stated simply that the evidence would be admissible.

During the victim's testimony regarding a time when the defendant touched her while they were watching a television show, the prosecutor asked the victim, "Did he ever show you any pictures when any of this was going on?" The defendant objected, and the trial court held an in-chambers hearing on the objection. The defendant argued that "if [the victim is] telling a story about an incident that is charged and pictures come up within that story, . . . that's one thing. But asking [the victim] about pictures spontaneously, he is not charged with that. . . . [T]hat's 404(b). It shouldn't come in." The State argued that Rule 404(b) would exclude only "prior bad acts that occurred prior to the time frame of the indictment and that might be propensity evidence. This is an act that occurred during the time period of the indictment; and, it's part and parcel to the res gestae of the crime." Without making any of the findings required by Rule 404(b), the trial court stated, "I will allow her to answer the question." Upon the return to the courtroom, the following exchange occurred:

> Q. (By Ms. Menke:) All right. I believe my last question to you . . . was if [the defendant] ever showed you any pictures?
>
> A. Yeah.
>
> Q. What pictures did he show you?
>
> A. Like, his private part.
>
> Q. Where was that picture?

A.     On his phone.

Q.     Did he say anything to you when he showed you the picture?

A.     "Look at this."

Q.     Do you remember what you were doing when he was showing you the picture?

A.     No.

Q.     Do you remember what you were doing when he was showing you the picture?

A.     No.

Q.     Do you remember where you were when he showed you the picture?

A.     No.

Q.     Do you remember if he still had that same phone at the time you told that this stuff had been going on?

A.     I don't know.

To be sure, the trial court failed to comply with the requirements of Rule 404(b) at either the pretrial hearing or the in-chambers hearing that occurred during the trial. Consequently, the court's ruling is entitled to no deference. We understand from the victim's testimony that the defendant showed the victim a photograph of his genitalia at some point. Despite the prosecutor's argument to the contrary, it is not clear from the victim's testimony that the defendant displayed the photograph during the time frame contained in the indictment. The first of the prosecutor's questions on the subject narrowed the time frame, but the defendant objected, and the victim did not answer that question. Instead, the victim answered the prosecutor's second question, which did not contain the same temporal limitation.

Moreover, we disagree that the fact that the display occurred during the time frame of the indictment renders it admissible per se. In *Rickman*, the supreme court stopped

-44-

short of declaring "a 'sex crimes exception' to the general rule that evidence of uncharged crimes is inadmissible," *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003), and instead adopted "a 'narrow, special rule' which allowed the state 'some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed,'" *id.* at 244 (quoting *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994)). Under this rule, proof that the defendant committed more instances of the charged offense than are contained in the indictment is admissible subject to the State's election of offenses at the conclusion of the proof. *See Rickman*, 876 S.W.2d at 828. This rule does not provide the State *carte blanche* to present proof of every sexual offense committed by the defendant, but, because election of offenses is only required where there is proof of more than one offense in the same *Blockburger* chain, the rule presumes that the proof of uncharged sexual conduct will be confined to supernumerary occurrences of the charged offenses.

That said, we agree with the State that testimony regarding the defendant's display of the photograph *could have* been admissible pursuant to Rule 404(b) to establish that the defendant committed the offenses against the victim for the purpose of sexual gratification, an element of aggravated sexual battery. Under the circumstances presented here, however, the State failed to make the connection. Based upon the proof presented, we know only that the defendant displayed to the victim at some point in time a photograph of his genitalia and said, "'Look at this.'" The victim did not specify that the display occurred at or near the time of any of the offenses, making it less relevant to his intent in committing the offenses, and no evidence attached a sexual motive to the display of the photograph.

Because the State failed to show that the evidence was admissible via the exception established in *Rickman* or as proof that the defendant committed the offenses for the purpose of sexual gratification, the trial court should not have admitted the victim's testimony about the photograph. The fleeting reference to the single photograph under the rather innocuous circumstances presented here, however, was most certainly harmless.

*V. Sufficiency*

The defendant next contends that the evidence was insufficient to support his convictions of rape of a child in counts one and five "because the State failed to establish the element of sexual penetration."[8] The State avers that the evidence was sufficient to support the convictions.

---

[8]The defendant does not challenge the sufficiency of the convicting evidence for his remaining convictions.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (1997). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

The State's election of offenses for count one, as expressed by the trial court during the jury instructions, was as follows:

> Count One of the indictment alleges an act of rape of a child against [the victim] (D.O.B. 1/11/2001), and refers to the following conduct: The defendant penetrated the victim's genital area with his penis. Using the anatomic drawing, the victim testified that the defendant moved back and forth with his penis inside her genital area. She said this happened on the floor in the defendant's bedroom, and something white came out of his penis and got on her hand.

With regard to this offense, the victim testified that the defendant tried to put "his thing" "in [her] private part" while they were on the floor of his bedroom. She said, "He pulled it out, trying to pull down pants, and then he sticked it in there, but, like, only, like - -

-46-

not inside, on the side, outside." She said that the defendant's penis went "inside, but not like - - not, like, deep inside. It's just the inside." She added that the defendant "did it, like on the outside, but inside almost." She indicated the exact location on a drawing of a naked girl, but she did not mark the location on the drawing. She clarified that the defendant's penis went "inside" but not "deep inside." The victim said that the defendant "[m]ov[ed] back and forth" until "white stuff" came "out of his private" and got onto her hand.

The State's election of offenses for count five, as expressed by the trial court during the jury instructions, was as follows:

> Count Five of the indictment alleges an act of rape of a child against [the victim] (D.O.B. 1/11/2001), and refers to the following conduct: The defendant penetrated the victim's genital area with his penis. Using the anatomic dolls, the victim testified that the defendant was holding both of her legs up while putting his 'private' inside her genital area.

With regard to this offense, the victim testified that as she lay on the bed, the defendant "was holding [her] legs and he just kept on holding [her] leg, and then he just kept on touching" her private with his private on "the outside, but not like - - not really - - like, sort of, on the inside, but not really." The victim again differentiated between "inside" and "deep inside" her vagina. She demonstrated the activity with anatomically correct dolls.

At this point, we deem it prudent to review the relationship between the sufficiency of the evidence and the State's election of offenses. The law is well-settled that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the accused has committed more offenses against the victim than were charged. *See State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001); *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). Most often, the election requirement arises in the sex-crimes context when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See Johnson*, 53 S.W.3d at 631; *Brown*, 992 S.W.2d at 389. "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Johnson*, 53 S.W.3d at 631.

Our supreme court has expounded upon the election requirement as follows:

> If . . . the evidence indicates various types of abuse, the

prosecution may identify a particular type of abuse and elect that offense. . . . Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation . . . to ensure that an election occurs, the trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence.

*State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993) (internal citations and footnote omitted).

In our view, the State's election was sufficient to narrow the jury's consideration in counts one and five, and the victim's testimony sufficiently established the offense of rape of a child in each count. The victim testified that the defendant touched the "inside" of her vagina but not "deep inside" with his penis. As our supreme court has observed, sexual penetration occurs "'in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient.'" *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000) (citing *Walker v. State*, 273 S.W.2d 707, 711 (Tenn. 1954)), and 3 Charles E. Torcia, *Wharton's Criminal Law* § 278 (15th ed. 1995) (noting that entry of the anterior of the female genital organ, known as the vulva or labia, is sufficient penetration for forcible rape or statutory rape; it is not necessary that the vagina itself be penetrated or that the hymen be ruptured)).

*VI. Due Process*

The defendant claims that his convictions of rape of a child in count one and aggravated sexual battery in count twelve violated principles of due process because those counts "stemmed from a single continuous criminal episode and involved a single criminal intent." The State contends that dual convictions are not prohibited by due process principles.

Citing *State v. Barney*, 986 S.W.2d 545 (Tenn. 1999), the defendant argues that the act that formed the basis of the child rape conviction in count one and the acts that formed the basis of the aggravated sexual battery conviction in count twelve were not separated by space or time, were not interrupted by an intervening event, and were committed

-48-

via the same intent. In *Barney*, our supreme court considered a challenge to dual convictions of aggravated sexual battery and rape of a child as violative of due process principles and concluded that "the 'essentially incidental' test, as developed in *Anthony* and its progeny, is not helpful in the context of sexual offenses because each separate sexual act 'is capable of producing its own attendant fear, humiliation, pain, and damage to the victim.'" *State v. Barney*, 986 S.W.2d 545, 548 (Tenn. 1999) (quoting *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn. 1996)). The court recognized the possibility of a due process violation attendant to convictions of more than one sexual offense arising from a single criminal episode and, to facilitate review, created a multi-factor test for

> determining whether conduct is directly facilitative, and thus incidental, or merely prepatory in the sense of intending to arouse the victim or perpetrator. These factors are:
>
> 1. temporal proximity -- the greater the interval between the acts, the more likely the acts are separate;
>
> 2. spatial proximity -- movement or re-positioning tends to suggest separate acts;
>
> 3. occurrence of an intervening event -- an interruption tends to suggest separate acts;
>
> 4. sequence of the acts -- serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and
>
> 5. the defendant's intent as evidenced by conduct and statements.

*Barney*, 986 S.W.2d at 548-49.

The analysis underlying the court's recognition of a due process issue of law when there are convictions of more than one sexual offense and its development of the multi-factor test relied on *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991). Recently, however, our supreme court overruled not only *Anthony* but all of its progeny. *See State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012) ("To be clear, *Anthony* and the entire line of cases including a separate due process analysis in appellate review are expressly overruled."). The *White* court specifically declared the due process issue attendant to dual convictions of kidnapping and an accompanying felony a question of fact to be determined by a jury "properly

instructed under the law." *Id.* at 577. In light of this recent change in the law, we question the continuing validity of *Barney's* multi-factor test for determining, as a question of law, whether dual convictions of rape of a child and aggravated sexual battery violate principles of due process.

*Barney* also addressed a challenge to dual convictions of aggravated sexual battery and rape of a child on double jeopardy grounds, which analysis relied on the holding in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996). In *State v. Watkins*, released on the same day as *White* to address the issue "whether separate convictions under different statutes constitute the same offense and violate the double jeopardy protection against imposing multiple punishments," *State v. Watkins*, 362 S.W.3d 530, 538-39 (Tenn. 2012), the court overruled *Denton* and abandoned the test adopted therein, *see id.* at 556. Moreover, the *Watkins* court criticized the analysis in *Barney*. *See id.* at 550-51.

Given that *Anthony* and *Denton*, the two cases that provided the analytical underpinnings for the decision in *Barney*, have been expressly overruled by our supreme court, we have grave doubts about the continuing validity of the test adopted in *Barney*. That said, we agree with the State that the challenged convictions, when analyzed using the *Barney* test, do not violate principles of due process. Count one, as framed by the State's election of offenses, alleged that the defendant penetrated the victim's genital area with his penis while she lay on the floor of his bedroom. Count twelve alleged that the defendant fondled the victim's genital area with his hand after she fell to the floor while trying to get away from him. The victim testified that the defendant pushed her to the floor and rubbed his hand on the "outside" of her "private, [her] front." Nothing in the victim's testimony indicated that the aggravated sexual battery was preparatory to the rape.

## VII.  Sentencing

Finally, the defendant challenges the sentence imposed by the trial court, arguing that the court should not have sentenced him within Range II for his convictions of rape of a child and should not have imposed partially consecutive sentences. The State asserts that the sentence was appropriate.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and

principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

*A. Child Rape Sentences*

The defendant contends that the trial court erred by imposing sentences of 28 years for each of his convictions of rape of a child because a 28-year sentence falls within Range II, and the defendant was a Range I offender. He claims that the trial court erroneously applied the 2011 amendment to Code section 39-13-522, which took effect in January 2012, to his convictions for offenses committed in 2010.

The current version of Code section 39-13-522(b)(2)(A) provides:

(b)     (1) Rape of a child is a Class A felony.

(2)  (A) Notwithstanding title 40, chapter 35, a person convicted of a violation of this section shall be punished as a Range II offender; however, the sentence imposed upon such person may, if appropriate, be within Range III but in no case shall it be lower than Range II.

T.C.A. § 39-13-522(b)(2)(A) (2012). At the time of the offenses in this case, the same section provided,

Notwithstanding title 40, chapter 35, a person convicted of a first or subsequent violation of this section shall be punished by a minimum period of imprisonment of twenty-five (25) years. The sentence imposed upon any such person may, if appropriate, exceed twenty-five (25) years, but in no case shall it be less than

-51-

the minimum period of twenty-five (25) years.

T.C.A. § 39-13-522(b)(2)(A) (2010). At the hearing on the motion for new trial, the State asserted that the 2012 amendment did not reflect a change in the law but was merely a clarification of the legislature's intent in providing the 25-year minimum sentence for child rape.

In this appeal, the State argues, as it did at the hearing on the motion for new trial, that the trial court did not sentence the defendant using the 2012 version of Code section 39-13-522(b)(2)(A) but instead imposed the 28-year sentences because they were "appropriate" under the 2010 version of the statute. In construing the 2010 version of the statute, however, this court explained,

> Rape of a child is a Class A felony, the range of punishment for which is fifteen to sixty years. T.C.A. § 40-35-112(a)(1) (2010). The statute provides that if the person convicted of this offense is sentenced in a higher range, *i.e.* as a multiple or persistent offender, then the sentence for each conviction may be set higher than the required twenty-five-year minimum sentence, if appropriate. By inference, if the defendant is sentenced as a Range I offender, as the maximum sentence for that range is twenty-five years, the sentence to be imposed must be twenty-five years for each offense of rape of a child.

*State v. Rhonda Louise Medley*, No. M2009-02446-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, July 12, 2011). We agree with this interpretation.

More importantly, however, the record establishes that the trial court did, in fact, sentence the defendant pursuant to the 2012 version of Code section 39-13-522(b)(2)(A). At the sentencing hearing, the trial court asked the prosecutor for "the range of punishment on each count." The prosecutor replied that the defendant was "a range one offender on all counts" but that the "range of punishment" for the convictions of rape of a child was "twenty-five to forty." A sentence range of 25 to 40 years is associated with a Range II sentence for a Class A felony. *See id.* § 40-35-112(b)(1).

Because that version of Code section 39-13-522(b)(2)(A) providing for a minimum Range II sentence for all convictions of rape of a child did not take effect until January 2012, it was inapplicable to the offenses in this case, which occurred in 2010. *See State v. Odom*, 137 S.W.3d 572, 582 (Tenn. 2004) ("[S]tatutes are presumed to operate prospectively unless the legislature has indicated a contrary intention."). Contrary to the

-52-

prosecutor's assertion at trial, the amendment to Code section 39-13-522(b)(2)(A) did, in fact, change the law regarding Range I sentencing for rape of a child to increase the potential punishment from 25 years to 40 years imprisonment. Regardless of the State's and the trial court's "understanding" of the amendment, the plain language of the 2010 version of the law provided only for a sentence of 25 years for a Range I offender convicted of rape of a child. *See Rhonda Louise Medley*, slip op. at 9. Accordingly, the application of the 2012 version of Code section 39-13-522(b)(2)(A) in this case violated the defendant's constitutional ex post facto protections. *See State v. Pearson*, 858 S.W.2d 879, 883 (Tenn. 1993). Consequently, the 28-year sentences imposed for the convictions of rape of a child must be modified to sentences of 25 years, the only sentence available for a Range I offender at the time the defendant committed the offenses in this case. *See Rhonda Louise Medley*, slip op. at 9.

## B. Consecutive Sentencing

The defendant also asserts that the trial court erred by ordering partially consecutive sentences, claiming that Code section 40-35-115(b)(5) "does not warrant the imposition of consecutive sentences in this case to the extent ordered by the trial court."

Recently, our supreme court held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. James Allen Pollard*, No. M2011-00332-SC-R11-CD, slip op. at 11 (Tenn. Dec. 20, 2013). Here, the trial court imposed consecutive sentences based upon its application of Code section 40-35-115(b)(5), which provides:

> The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

T.C.A. § 40-35-115(b)(5). The court noted that the damage inflicted upon the victim was "demonstrated in the victim's-impact statement, where she talks about these offenses have affected her life" and that "the consecutive sentence reasonably relates to the seriousness of the offenses committed."

In her victim impact statement, the victim stated, "When someone is around me I'm scared." She also said, "I have been thr[ough] a lot where it really hurts is inside. I have been hiding this [too] long but oh well all those fears became into tears." She asked that the defendant be incarcerated for 10 years.

The trial court ordered the sentences imposed for the defendant's convictions of rape of a child to be served consecutively to one another and that the sentences imposed for the convictions of attempted rape of a child and aggravated sexual battery be served concurrently to each other and concurrently to the sentences imposed for the child rape convictions. Because the record reflects that the trial court considered the appropriate statutory principles, we cannot say that the trial court abused its discretion by ordering partially consecutive sentences.

*Conclusion*

The evidence does not preponderate against the trial court's determination that the defendant was competent to stand trial. Although the evidence does preponderate against the trial court's finding that the defendant's statement was voluntarily given to the police following a voluntary and knowing relinquishment of his constitutional rights, the trial court's failure to suppress the statement and its admission at trial were harmless beyond a reasonable doubt. The trial court erred by finding that the defendant voluntarily consented to the taking of a DNA sample but did not err by admitting the tests results obtained utilizing that sample under the independent source doctrine. The trial court erred by permitting the victim to testify that the defendant showed her a photograph of his genitalia, but the error was harmless. The evidence of penetration was sufficient to support the defendant's convictions of rape of a child in counts one and five, and no issue of due process attends the defendant's convictions of rape of a child in count one and aggravated sexual battery in count twelve. The trial court erred by imposing a Range II sentence in violation of constitutional ex post facto protections, and the sentences for each of the convictions of rape of a child is modified to 25 years. Otherwise, the sentencing decision of the trial court, including the imposition of consecutive sentences, is affirmed.

Accordingly, the judgments of the trial court are affirmed as modified.

_____
JAMES CURWOOD WITT, JR., JUDGE